Final case before the court today is Barnes v. Department of Defense case number 161754 Appeal from the Merit Systems Protection Board Mr. Schwartz, you want five minutes for rebuttal? Yes, please, Your Honor. Morning, Your Honors. May it please the court, my name is Frederick Schwartz on behalf of Mr. Barnes. Let me first apologize to Judge Reina. There were a few typos in my brief that I discovered when I reread it. Nothing as egregious as the last time and I hope that's my guess. Thank you very much. Let me say what we're not here to discuss. Everybody agrees Mr. Barnes drove under the influence of alcohol. Everybody agrees that he pled guilty to a slightly different charge, but in essence the same charge. Everybody agrees that it was a crime. Everybody agrees that he should receive some kind of punishment or penalty. Now what we don't agree about is whether or not the the penalty was appropriate. There are constitutional requirements and statutory requirements, which in fact the MSPB discussed in a report that they issued and that is why I quoted it extensively in my brief. There is also the algorithm for determining what the penalty should be and that algorithm is what we call Douglas versus Veterans Administration. All that and so that's that's the scope of review and what I did in my brief is because it was a complicated case and there were many complaints and in terms of what the deciding official believed that Mr. Barnes did and also many aspects of the Douglas analysis, which is the device of the board so that so that it's able to determine whether or not it was a process that met due process. Okay, if assuming that we're that you're deep into the Douglas factors, which that's clearly what I think the emphasis of both your argument and your brief is. If we find for instance that that we would disagree with the board on one of the Douglas factors is that enough for us to send it back? No, that's what Judge Bryson called harmless error. But then in fact it takes more and you know, I think it's it's less science, less algorithmic and more just a feeling that that there that they were wrong sufficiently or the deciding official was wrong sufficiently so that the board should take another look at it. And I think the remedy that we're asking from this court is that you send it back, that you review it and look at particularly what this court found to be an inappropriate matter. For example, we have the question of whether or not whether or not Mr. Barnes asked the deputy to give him special treatment and I've dealt with that extensively and that's something that the court can actually look at because in fact it wasn't a credibility determination. But that's a type of issue that we can't look at. I mean the evidence does show that he was holding out his badge and saying are you going to follow up with this? Are you going to follow up? He kept repeating that. Well, they took that to mean some sort of asking for special treatment. I'll tell you counsel what my what I find important in this case goes to the conscious and willful decision-making and the deciding official based determination. I mean the punishment is based on the conclusion that everything that Mr. Barnes did while under the influence is willful and conscious. Your argument is that it wasn't willful and conscious because he was drunk at the time. Well, he was driving under the influence and that's somewhat different. Well, the other belligerency towards the arranging officer and the holding out the badge that those were not willful and conscious you argue because he was intoxicated. Well, yes but if I could just very quickly go back to to your initial point, Judge Reyna. The testimony was first of all that when he was leaving or when he was getting out of his vehicle, which had overturned, he was asked for license and registration which is typical of what's done and he took out of his pocket his wallet and took his license and gave it and the deciding official testified at the hearing that he in fact had seen that situation before. The people keep their police credentials and their license and in the same wallet. I'm not sure that's exactly what the record reflects. My recollection of the police officer's testimony was that as he approached the car that the that Mr. Barnes was holding up, he was standing up in this the overturned car and holding up his police credential before there had been any request for identification. Is that, am I, is my recollection correct? Because that that puts a rather different coloration on it, it seems. Well, it's, I believe that's correct. Is it not? That was his testimony, but in fact what he was holding up did contain his license. Well, yes, but he was holding up that police identification. I think, well, anybody who's familiar with the practice of badging and I'm sure this police officer was familiar with the practice of badging. You know what I'm talking about. Yes. Badging. Knows it when they see it and he he's holding up his, as the police officer approaches, he's holding up his badge. That's badging. You'd agree with that, would you not? No. No? I'm sorry, Judge Bryson, but but it seems to me that it's a perfectly reasonable explanation was that he had taken out of his pocket the his, out of his pocket, is water which contained that information. But that that isn't primarily what the police officer was thinking about. What he, what he said is, well, in the car he said, how far are you going to take this twice, several times, which is essentially twice. And then that is not are you going to give me special treatment? But more important, the evidence also showed, and it was uncontroverted, that Mr. Byron said right away, you know, call report this to my, to my department, report this to my department. And if in fact he had wanted not to have some kind of penalty imposed, he wouldn't have done that. And his testimony as well, and was it the officer's testimony as well, is that, you know, it's not unusual for somebody to say, you know, how far are you going to take this? What is the charge going to be? What am I going to be charged with? It's quite ordinary. But, but I, I think Judge Bryson, because you're familiar with, with the term badging, which, which does occur, if you, being familiar with that, you can, in your mind, jump to the conclusion that that's what he was doing. Well, but that's not predominant evidence. That, that is just some evidence based upon your experience as contrasted with all the evidence, particularly the fact he didn't say it, he didn't pursue it, he immediately told his agency that, that he had been arrested. All this... Well, it was the officer's perception. Well, that's right. And I am not, nobody questions that the office, this was the officer's perception. And isn't that fact alone enough substantial evidence to support the board's conclusion? I mean, that's the problem. We can't rethink how the board weighed these things. When we question Douglas factor analysis, it's usually because they either completely didn't weigh a factor, or there was absolutely nothing to support the way they weighed it. Not, I've rarely seen a case, or I don't, I can't think of a case in which we've said, well, yeah, there's evidence, but we probably would have gone the other way. Well, but a percept, a perception is not evidence unless it's based on some kind of, of presumption, which is acceptable. But, but I don't think this court has ever said where there isn't predominant evidence, which is the responsibility of the agency, that they can ignore that responsibility. It's necessary that there's a rational connection between the facts found, and one of the facts was that, that that particular officer immediately thought that he was being asked to do something, even though he wasn't being asked to do something, and, and the choice made. And the choice made was, yes, Mr. Barnes did this. In fact, meant this. And in fact, there is no evidence that he meant it. It was just a perception on the part of the officer. But as Judge Ramos said, the issue, it almost doesn't matter. All these things which occurred during this seven-hour period are subsumed, because if he did do it, he did it without a conscious, in essence, without intent, without, it wasn't conscious. He was under the influence of liquor. Everybody agrees with that. And in the decision made by the... So you're saying that the fact that he was voluntarily under the influence isn't a defense to the fact of the DUI, but it's a defense to the rest of his behavior? His... I think, Judge O'Malley, the issue is a little bit narrower than that. The issue is, if, in fact, and you've had cases where somebody has taken cocaine or some other drug, and and there was a Virginia case I cited where somebody took medication, and all these are situations where there should have been some kind of foreseeability. But this, this, there wasn't in this case. He had had three drinks. That was the only testimony. But the evidence shows that he attended his supervisor's Thanksgiving party. He took his own alcohol. It wasn't there. He took it with him. He poured his own drinks. All that's, so he voluntarily, he took all the steps to become intoxicated. And it's, it's, it's difficult for me to, to buy the argument that the results of what happened after that, that voluntary action, shouldn't be deemed to be voluntary, because he was intoxicated. When you're intoxicated, you don't have control over your, yourself. Well, if it's, if it's an issue about being intoxicated, he would know. First of all, he brought it as a gift and left it. It is an issue. This is a DWI we're talking about. Yeah, no, no, no, no, no, I understand that. So, so he brought his, he brought the liquor as a gift, and he, in fact, poured three drinks. But that, but I, I don't think that's the issue. The issue is whether he understood that he was drinking so much that he, in fact, would, would not meet the legal standard, because I can have a drink or two at dinner, and, and, and yet, if I drove, assuming I still had a license, which I don't, but, but assuming, assuming that I still drove, I would not, I would not think that I, I would meet the standard to be arrested. And there's no evidence that he understood that, that, that he was so intoxicated that he, at that point, that he was a danger on the highway, or that, in fact, you know, he was committing a crime, because it's a crime which is improper. It isn't just drinking. I mean, as I said in my brief, if you go to a restaurant, you see people finishing off, two people finishing off a bottle of wine. That probably would be enough to impair their driving, but, but they don't think that they meet the legal standard. Consequently, it is not intentional. What is intentional is, well, first of all, intention has nothing to do with DUI, but what it does have to do is whether he was immoral, and so immoral that he could not be a police officer, and, and that's what the deciding official said. He said, I'm going to impose my own morality on this, and he intentionally committed a crime because he made himself so drunk that he violated the standard, and there's absolutely no evidence at all that, that, in fact, he did that. Okay, you're almost done with your rebuttal time. We'll give you three minutes for rebuttal. Thank you. Okay. Good morning, Your Honor. May it please the court. As Mr. Schwartz has articulated, the sole issue before the court in this appeal is whether the MSP erred in sustaining the penalty of removal in this case. This court defers to the agency's determination of the penalty unless it is totally unwarranted in light of the relevant factors. The DUI was a misdemeanor offense, right? I believe that the reckless driving that was ultimately, Right, it was played down. Okay. I believe it was a misdemeanor offense. All right, and is it true that, that every time anyone in a law enforcement capacity is charged with a misdemeanor, that, that they are fired? I, there's certainly no per se rule, at least that I am aware of, that a law enforcement officer is fired any time there is a single violation of a misdemeanor. However, what we're looking at here is the totality of the circumstances in this case. First of all, this misdemeanor is a DUI or reckless driving, which includes putting both Mr. Barnes and the public at risk. I think, I think the record shows, and I think it was decided that, that the, by virtue of having the DUI, that did not reflect, reflect on his capacity or his ability to do his job. Correct? It did not, it did not affect his ability to be a police officer. Yeah, I mean it was conduct unbecoming, that's what they found. Yes, your honor. I mean the conduct unbecoming sort of encapsulates the, the conduct involved in the DUI. I think what your honor is getting at is that the mechanics of the job were not undermined by the, the, the guilty plea effectively. So he has a misdemeanor, he completes drug school, I mean alcohol school, call it. Yes, your honor. Right, and he takes steps to rehabilitate himself, and he doesn't have any further incidents of a DUI. Wasn't the, the penalty of termination a bit harsh in this case? Well again, your honor, looking at all of the, the evidence here, the, the deciding officials primary concerns were sort of two overarching themes. First, that he had, based on the decision, very poor decision to drink and drive, based on his conduct during his arrest and, and subsequent hearings, that the deciding official had lost confidence in Mr. Barnes's judgment, which is a critical factor, critical need in a police officer, and is articulated in the police officer job description, is the ability to have incredibly good judgment. We've had a number of those cases where there's a loss of confidence in the ability of the police officer or the, the employee, but normally those involve moral turpitude issues, either, either lying or stealing or things of that nature, but this is not a moral turpitude issue, is it? Not specifically, your honor, no, but it does involve an individual who is charged with public safety, putting the public in danger by his, by his actions. It involves a law enforcement officer showing disregard to other law enforcement officers and to other members of the law enforcement community. There wasn't even really any real consideration of rehabilitation here. I mean, the, you know, the, you sort of just throw out that, well, he was convicted of a crime. I mean, it's legion how many law enforcement officers are convicted of domestic violence all the time and charged with misdemeanors, and they never lose their jobs. They never lose their right to carry their guns. So why is it that here you never considered the fact that, that he had never been in trouble with the law before and he went through the, the alcohol rehabilitation programs? Well, your honor, first, I think the deciding official did consider those factors. They're documented in his, his Douglas analysis. He discussed them both in his decision and before the administrative judge, but he felt that they were outweighed by, again, his essentially lack of trust in Mr. Barnes's judgment going forward and the fact that, well, I don't think that's a fair characterization because when you go through which ones they found to be, factors they found to be mitigating, which ones they found to be neutral, they actually found the rehabilitation factor to be an aggravating factor without having considered the, those things that I pointed out. So I guess, so it's not really fair to say that he considered those, but they were outweighed. He actually said that it was aggravating because he couldn't be, he couldn't undo the, the misdemeanor charge. Your honor, well, first of all, I don't think that the, the fact of not being able to undo the charge itself was the sole concern in the, in the rehabilitation category. The deciding official also discussed the public's trust in the Pentagon Police Force by having an officer with this kind of conviction on his record. Also discussed the safety of the public. The, the rehabilitation did not necessarily go specifically to the individual, but was also discussing that the mission of the force as a whole as well. And again, even bringing that factor down slightly, taking the, the, the goal here is to determine whether the penalty was totally unwarranted in light of all of the factors considered, even lessening the rehabilitation factor slightly. The nature and seriousness of the offense, the consider, the fact that the penalty was within the range, the reasonable range, the fact that Mr. Barnes was clearly on notice as to the, the type of violation he was committing. And again, his conduct during this event, all taken as a whole, support the deciding official's decision to remove Mr. Barnes. I want to touch on just briefly an issue that was raised during Mr. Schwartz's testimony. This question of whether the individual can have the requisite intent to effectively show poor judgment while intoxicated. The issue that the deciding official is looking at here is not a legal definition of intent, whether Mr. Barnes intended to disrespect a police officer. He is looking at Mr. Barnes's judgment during this entire process. His decision to drink at several alcoholic beverages, knowing as he is a police officer, their effect on his ability to drive, and the fact that his impaired ability to drive would be a danger to himself and the public. He did exercise at least some element of judgment in this interaction with the other law enforcement officials. He did make conscious decisions to hold up his badge to repeatedly ask how far this was going to be taken to interact with the magistrate. All of these circumstances as a whole affect Mr. Barnes's judgment and affect the deciding official's perception of his ability to maintain that judgment as a police officer. Unless the court has any further questions, we would simply ask that the court affirm the MSPB's decision in this case. Okay, thank you. Thank you. It's true, Your Honor, that the agency does not have a per se rule, but this particular deciding official did. He said so. He said it a number of times in his Douglas analysis, that I cannot have faith in anybody who violates the law, any police officer who violates the law. He even went so far as to say it would be okay if a doctor did it. I wouldn't think he should lose his license, but a police officer, a police officer should, under no condition, should do what Mr. Barnes did. Do you have any evidence that others in the Pentagon police force who were convicted of misdemeanor offenses did not lose their jobs? Well, we have that one case that I cited that there was testimony. There is a process called clean records, as the court knows, and we were unable, we had suggestions of who else might be involved in a similar situation, but as I point out, the judge refused to let us call these people, and there was an impediment to proving it, but... Wait, wait, wait. This is discussed in the opinion at pages 40 through 41, and my takeaway from that was that you were given the identity of several people, and it turns out that none of them had equivalent situations, right? I mean, this is, you know, the section of the opinion I'm talking about where the human resources specialist was asked to come up with some cases for individuals? That's correct, Judge Bison, but it isn't absolutely correct. What it, what was determined is that they had no records. Right. It was able to be found by that personnel person, but there is a process called clean records, which is, you know, any offenses are taken from your file after certain requirements are met, either through settlement or through being removed for 14 days or 25 days. But there were details of these other individuals in their situations, but they just were, one involved not securing his service revolver adequately, right? Well, there was only one person, and they did two things, domestic violence and misuse of weapon, and then his penalty was reduced from, I believe it was parole counseling. And, but there were other examples, and the court, as we point out, did not allow us to call those people, did not allow us to do anything except have their records looked at. And also in terms of the seriousness or the judgment, as you pointed out, Judge O'Malley, it's strictly a moral issue. This person is not morally able to be a police officer. It's that deciding official's view of the morality that you must have to be a police officer. And it goes back, finally, to Judge Reyn, I mean, Judge Reyna's question, or decision or determination, that if you, in fact, have several drinks, whether you intend all the consequences of what's going to happen, and for the police officer, for the deciding, or the AJ to say, well, it's a matter of common knowledge for police officers that if you have over a five-hour period three drinks and a beer, that you are violating the law and you are a danger. He had no idea it was going to be a danger, and in fact, he wasn't a danger. He was able to drive to his friend's house 20 minutes away and able to drive home. And if it were not for a deer, he might have very well gotten home. So he was brought to the door. Nobody told him that, in fact, that, in fact, you know, he was wobbling or unsteady. And I know Judge O'Malley's about to say my time's up, so I'll sit down. Thank you. Okay. All right, the cases will all be submitted.